IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

REBECCA MEDINA,

        Plaintiff,

vs.                                        No. **CIV 03-0533 MCA/RLP**

INCOME SUPPORT DIVISION,
STATE OF NEW MEXICO,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's *Motion for Summary Judgment* [Doc. 25], filed March 15, 2004.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court finds that the motion is due to be granted in its entirety.

## I. BACKGROUND

On May 6, 2003, Plaintiff Rebecca Medina filed a *Complaint for Damages* against her former employer, Income Support Division, State of New Mexico (ISD), alleging hostile-work-environment sexual harassment (Count I) and retaliation (Count II), in violation of Title VII.  [See generally Doc. 1].  Medina is a heterosexual female who was employed by ISD from April 2001 until September 2002.  [Id. at 1-2].  It is uncontroverted that during Medina's tenure with ISD, Debie Baca was the office director and was publicly open about her sexual orientation – gay/lesbian.  [Id. at 2; see also Doc. 34, Exh. 9].  Medina alleges that others in the workplace were openly gay or lesbian and contends that "because [her] sexual

preferences did not accord with those of peers and [Baca], [Medina] was subjected to a work environment permeated with hostility, intimidation, exclusion, and disparate treatment." [Doc. 1 at 4]. It is uncontroverted that Medina was not the only heterosexual employee in the workplace. [Doc. 30 at 5; Doc. 34, Exh. 4, Dec. 10, 2003 deposition of Rebecca Medina at 18]. Specifically, Medina alleges that Baca (1) sent her a number of sexually explicit e-mail messages, (2) made sexually charged comments and gestures in the workplace, (3) bared her breasts at the office Christmas party, and (4) created an atmosphere that rewarded homosexual employees while punishing heterosexuals in the office. [Id. at 3].

Medina further contends that "[p]romotional preferences were routinely given to gays/lesbians and non-gays/lesbians were treated differently, for the sole reason that Ms. Baca preferred gays/lesbians in the office," and that, in time, Baca excluded Medina from staff meetings, luncheons, and other office activities; advised co-workers not to speak to her; and refused to acknowledge Medina's presence in the workplace. [Doc. 1 at 3]. According to Medina, Baca's preferences caused Medina to be denied "due and fair" consideration for a number of promotional positions for which she was qualified, and that "[l]esser-qualified females" were selected instead. [Id.]. To be promoted, insists Medina, an employee had to be either gay or one of Baca's favorites. [Doc. 34, Exh. 4, Dec. 10, 2003 deposition of Rebecca Medina at 38-39].

Medina's complaints were investigated by the Human Services Division Office of Human Resources. That investigation culminated in a letter of warning to Medina for, among other things, having failed "to make a good faith effort to ensure that the allegations

2

[she had] presented [were] accurate and truthful."   [Doc. 30, attached Sept. 20, 2002

memorandum from Marise McFadden to Rebecca Medina at unnumbered 4; see also attached

Aug. 30, 2002 Investigative Report].  The warning letter further noted that investigators were

unable to substantiate any of Medina's sexual harassment charges and believed that she had

filed her complaint because she was not promoted to the Clerk Supervisor position for which

she had applied.  [Doc. 30, attached Sept. 20, 2002 memorandum from Marise McFadden

to Rebecca Medina at unnumbered 4].  On September 12, 2002, Medina resigned from ISD

and took a position with the Commission on the Status of Women (CSW).  [Doc. 30 at 6].

Medina now alleges that the actions of Baca created a hostile work environment, which, in

turn, establishes an actionable form of sexual discrimination under Title VII.

## II. ANALYSIS

### A.  Summary Judgment Standard

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a

motion for summary judgment is made and supported as provided in this rule, an adverse

party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."

Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts

showing that there is a genuine issue for trial."  Id.  Judgment is appropriate as a matter of

law if the nonmoving party has failed to make an adequate showing on an essential element

of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying

a motion for summary judgment must be admissible or usable at trial (although they do not

necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324.

It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses,

or make factual findings in ruling on a motion for summary judgment.  Rather, the Court

assumes the evidence of the non-moving party to be true, resolves all doubts against the

moving party, construes all evidence in the light most favorable to the non-moving party, and

draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526

U.S. 541, 551-52 (1999).

### B. Title VII

#### 1. Discrimination on the Basis of Sex

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an

employer . . . to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin."  42 U.S.C. § 2002e-2(a)(1).  The phrase "terms, conditions or

privileges of employment" is an expansive concept, sweeping within its protective ambit the

practice of creating a working environment heavily charged with sexual discrimination.  See

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 66 (1986) (quoting Rogers v. EEOC, 454 F.2d

234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957 (1972)).  For that reason, sexual

harassment resulting in the creation of a hostile work environment has been held to be an actionable form of sexual discrimination under Title VII.  Id. at 73.

Acknowledging that her case is "atypical [of the more common male-female hostile-work-environment sexual harassment case] in that the same-sex aspects of this case involve hostility and harassment flowing from a lesbian supervisor to a heterosexual female[,]" Medina relies on the holding in Oncale v. Sundowner Offshore Servs. Inc., et al, 523 U.S. 75 (1998) that "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant . . . are of the same sex."  Oncale, 523 U.S. at 79.  Oncale went on to set forth three "evidentiary routes" that a plaintiff may follow in pressing a claim of same-sex harassment.  Id. at 80-81.  In the first case, the plaintiff establishes that she was the target of explicit or implicit proposals of sexual activity made by another woman who is gay or credibly believed to be gay.  See id. at 80.  Next, the plaintiff shows that she was "harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser [was] motivated by general hostility to the presence of women in the workplace."  Id.  A plaintiff who elects the third evidentiary route may offer direct comparative evidence as proof of the manner in which the harasser treated members of both sexes in a mixed-sex workplace.  Id. at 80-81.

Nothing in Oncale suggests that the three above-described methods are exclusive.  See generally Oncale, 523 U.S. 75; see also Sheperd v. Slater Steels Corp., 168 F.3d 998, 1009 (7th Cir. 1999) ("we discern nothing in the Supreme Court's [Oncale] decision indicating that the examples it provided were meant to be exhaustive rather than instructive.  The

Court's focus was on what the plaintiff must ultimately prove rather than the methods of doing so). Indeed, the Third Circuit has held that a plaintiff might also satisfy his or her evidentiary burden by demonstrating that the harasser was acting to punish the victim's non-compliance with gender stereotypes.[1] Bibby v. Phila. Coca Cola Bottling Co., 260 F.3d 257, 264 (3rd Cir. 2001). In her *Response to Defendant's Motion for Summary Judgment*, Medina asserts that Baca sought to punish her for non-compliance with gender stereotypes as this additional evidentiary route is articulated in Bibby. [Doc. 34 at 15].

The Court has considered the facts of this case in light of the above-detailed evidentiary routes and concludes that Medina has failed to establish that she was discriminated against because of sex. See Oncale, 523 U.S. at 81. First, while it is not disputed that Baca is gay, Medina makes no allegation – nor does she set forth any specific facts – that Baca's conduct was motivated by sexual desire. Similarly, Medina neither contends nor sets forth any specific facts tending to show that Baca acted out of a general hostility to the presence of women in the workplace. See id. at 80. To the contrary, Medina argues more than once that women – so long as they were gay – were preferred, favored, and rewarded by Baca with workplace promotions. [Doc. 1 at 3; Doc. 30, Exh. 10, Oct. 16, 2002 affidavit of Rebecca Medina; Doc. 34, Exh. 4, Dec. 10, 2003 deposition of Rebecca

---

[1]   The gender stereotype method derives from a Supreme Court case in which the Court reviewed the discrimination claim of a woman who had been denied partnership in an accounting firm in part on the basis that she was "macho," "overcompensated for being a woman," needed "a course in charm school," was "masculine," and was "a lady using foul language." Bibby v. Phila. Coca Cola Bottling Co., 260 F.3d 257, 263 (3rd Cir. 2001) (*quoting* Price Waterhouse v. Hopkins, 490 U.S. 228, 235 (1989).

Medina at 38-39].   Similarly, rather than demonstrate that Baca treated women and men differently, Medina asserts that Baca treated heterosexual employees differently from homosexual employees.   [Id.].   With respect to the fourth evidentiary route set forth in Bibby, Medina offers nothing more than the conclusory statement that she was punished for non-compliance with gender stereotypes because she opposed Baca's conduct.   [Doc. 34 at 15].   As the Oncale Court emphasized, "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discrimination* . . . because of  . . . sex."   Oncale, 523 U.S. at 81 (emphasis in original); see also Stahl v. Sun Microsystems, Inc., 19 F.3d 533,  538 (10th Cir. 1994) ("If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment.").   Accordingly, the Court finds that Medina has failed by any evidentiary route to prove discrimination on the basis of sex.   See Oncale, 523 U.S. at 81.

## 2. Discrimination on the Basis of Sexual Orientation

A comprehensive review of the pleadings and other record evidence reveals that Medina additionally complains that she was victimized because of her heterosexual orientation.  For example, Medina asserts that Baca created a workplace that rewarded gay and lesbian employees while punishing heterosexual employees, routinely promoted gay and lesbian employees over heterosexual employees, and treated gay and lesbian employees differently from heterosexual employees "for the sole reason that  . . . Baca preferred

7

gays/lesbians in the office." [Doc. 1 at 3]. According to Medina, because her sexual preference "did not accord with those" of her co-workers[2] and Baca, she was subjected to a hostile work environment as well as disparate treatment. [Id. at 4]. Additionally, in her complaint to the Office of Human Resources, Medina stated that, because of her heterosexuality, Baca denied her advancements, excluded her from staff meetings, instructed co-workers not to speak to her, and personally ignored her. [Doc. 30, Exh. 9; Exh. 10, October 16, 2002 affidavit of Rebecca Medina, at unnumbered 1-2].

By its terms, Title VII creates no cause of action for discrimination on the basis of sexual orientation. 42 U.S.C. § 2002e-2(a)(1). Moreover, courts to date have not yet extended the scope of protection to include sexual orientation. As the Third Circuit explained, "Congress has repeatedly rejected legislation that would have extended Title VII to cover sexual orientation." Bibby, 260 F.3d at 261; see also Simonton v. Runyon, 232 F.3d 33, 36 (2nd Cir. 2000); Spearman v. Ford Motor Co., 231 F.3d 1080, 1085 (7th Cir. 2000); Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 143 (4th Cir. 1996) (dictum); Williamson v. A.G. Edwards and Sons, Inc., 876 F.2d 69, 70 (8th Cir. 1989).

Inasmuch as Medina relies on Oncale in support of her contention that Title VII protections extend to discrimination based on sexual orientation, the Court is unpersuaded. To the extent that Oncale touched at all on the issue of sexual orientation and Title VII, it did

---

[2] As explained in Part I above, it is uncontroverted that Medina was not the only heterosexual employee in the workplace. [Doc. 30 at 5; Doc. 34, Exh. 4, Dec. 10, 2003 deposition of Rebecca Medina at 18].

so by way of instructing that the converse of the reasonable assumption to be drawn in most male-female sexual harassment situations — that explicit or implicit proposals of sexual activity would not have been made to a member of the same sex — is equally available to a plaintiff alleging same-sex harassment by one who is gay or at least credibly believed to be gay.  See Oncale, 523 U.S. at 79.  That the focus is on the individual's sex, as opposed to the individual's sexual orientation, is further demonstrated by the Court's pronouncement that "'[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 25 (1993) (Ginsburg, J., concurring)).  For these reasons, the Court finds that Defendant ISD is entitled to summary judgment on this issue.

### 3. Retaliation

In Count II of her *Complaint for Damages*, Medina asserts that she was disciplined for having made complaints of sexual harassment to the State Human Resources Department. [Doc. 1 at 5-6].  Title VII makes it an unlawful employment practice for an employer to discriminate against any employee who has opposed an unlawful employment practice, or because he or she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing relating to unlawful employment practices.  42 U.S.C. § 2000e-3(a).  "A plaintiff may maintain an action for retaliation based on participation in a protected proceeding regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII."  Jeffries v. State of Kan., 147 F.3d 1220, 1231

(10th Cir. 1998).

In order to establish a prima facie case of retaliation, Medina must show that (1) she engaged in protected activity, (2) ISD took an adverse employment action against her, and (3) there exists a causal connection between the protected activity and the adverse action. See Tran v. Trustees of State Colleges in Colorado, 355 F.3d 1263, 1266 (10th Cir. 2004). If Medina establishes her prima facie case, the burden of production shifts to ISD to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Should ISD meet this burden, summary judgment is warranted unless Medina shows the existence of a genuine issue of material fact as to whether the reasons for the adverse employment action proffered by ISD are pretextual. See Wells v. Colorado Dept. of Transp., 325 F.3d 1205, 1212 (10th Cir. 2003).

"Although the Tenth Circuit liberally defines an 'adverse employment action,' its existence is determined on a case by case basis and does not extend to a mere inconvenience or an alteration of job responsibilities." Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir.2000). To constitute adverse action, the employer's conduct must be "materially adverse" to the employee's job status. Sanchez v. Denver Pub. Schs., 164 F.3d 527, 533 (10th Cir.1998). Indeed, the complained-of conduct must effect "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Aquilino v. Univ. of Kansas, 268 F.3d 930, 934 (10th Cir.2001) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).

10

While the Court is troubled by the fact that ISD, whose policy apparently is to encourage the reporting of sexual harassment and other workplace misconduct, disciplined Medina for having made just such a report, the Court nonetheless concludes that ISD's conduct in issuing a written warning to Medina falls short of that required to support a finding of an adverse employment action. See Aquilino, 268 F.3d at 934. Assuming without deciding that Medina has established elements (1) and (3) of her prima facie case, the Court finds that, under the circumstances, the written warning cannot be deemed an adverse employment action. This determination is based on the following undisputed facts: (1) Medina applied for a position with CSW in July or August of 2002; (2) on September 11, 2002 Medina was interviewed and offered the position; (3) Medina resigned from ISD on September 12, 2002; (4) the written warning bears a date of September 20, 2002; (5) Medina received the warning, which was never placed in her personnel file, on September 20, 2002; and (6) Medina began working with CSW on September 27, 2002. [Doc. 30 at 6-7]. Because Medina had already been offered the position with CSW and began working there before the reprimand was either written or received by her, the Court finds that the written warning could not have affected the terms and conditions of Medina's employment with ISD. See Pacheco v. Whiting Farms, Inc., 365 F.3d 1199, 1206 (10th Cir. 2004) (in retaliation action brought pursuant to Fair Labor Standards Act, defining adverse employment action as "a detrimental change in the terms or conditions of employment."); see also Trujillo v. Univ. of Colorado Health Sciences Ctr., 157 F.3d 1211, 1217 (10th Cir. 1998) (refusing to find adverse employment action where plaintiff/employee's dismissal preceded or occurred

in conjunction with alleged retaliatory conduct).

To the extent that the adverse employment action is alleged to be ISD's failure to promote Medina to the Clerk Supervisor position for which she applied, the Court finds that ISD has demonstrated that a more qualified applicant with 28 years' experience in a similar position was ultimately selected. [Doc. 30, attached deposition of Michelle Jones at 12-13, attached Aug. 30, 2002 Investigative Report at 9-10; Doc. 34, Exh. 3, Dec. 3, 2003 deposition of Debie Baca at 39-41]. The Court further finds that Medina has not demonstrated that ISD's reasons for not promoting her were a pretext for discrimination. See Wells, 325 F.3d at 1212. For these reasons, the Court concludes that ISD is entitled to summary judgment on Medina's claim of retaliation.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that there exist no genuine issues of material fact to preclude entry of summary judgment in favor of Defendant ISD on the Title VII claims asserted in Counts I and II of Medina's *Complaint for Damages*.

**IT IS, THEREFORE, ORDERED** that Defendant's *Motion for Summary Judgment* [Doc. 25] is **GRANTED**.

**SO ORDERED** this 9th day of June, 2004, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

12